UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

    v.

JAMES PARKS,

        Defendant.

19-CR-87-LJV-JJM
DECISION & ORDER

---

      Before the Court is a motion for reconsideration filed by one of the defendants, James Parks ("James").[1] Docket Item 1240. Along with his son, Lavon Parks ("Lavon"), James was convicted after a jury trial of various drug and firearm offenses. *See* Docket Item 1057. James asks this Court to reconsider the portion of its decision and order on his Rule 29 motion related to his aiding and abetting the discharge of a firearm (counts 4 and 5). More specifically, James argues that this Court overlooked the Second Circuit's decisions in *United States v. Medina*, 32 F.3d 40 (2d Cir. 1994), and *United States v. Delgado*, 972 F.3d 63 (2d Cir. 2020), which he cited in his Rule 29 briefing but were not discussed in the Court's decision and order. *See generally* Docket Item 1240.

      This Court indeed considered *Medina* and *Delgado* when it issued its decision and order, but for the reasons explained below, both cases are inapposite. Thus, the Court denies James's motion for reconsideration.

---

[1] Because the two defendants have the same last name, the Court will refer to them by their first names solely for ease of reference.

## LEGAL PRINCIPLES

"Motions for reconsideration brought in criminal cases are assessed under the civil reconsideration standard, since there is no express criminal procedure provision for such motions." *United States v. Stevens*, 2021 WL 48516, at *1 (W.D.N.Y. Jan. 6, 2021) (citing *United States v. Larson*, 2013 WL 6196292, at *2 (W.D.N.Y. Nov. 27, 2013)), *aff'd*, 857 F. App'x 44 (2d Cir. 2021) (summary order). "Reconsideration is generally justified in any one of the following three circumstances: (1) an intervening change in controlling law; (2) new evidence; or (3) the need to correct a clear error of law or to prevent manifest injustice." *Id.* (citing *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)); *see also Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (explaining that "reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court").

## DISCUSSION[2]

As noted above, James argues that this Court's decision overlooked the Second Circuit's decisions in *Medina* and *Delgado* and that under those cases, his Rule 29 motion should be granted as to counts 4 and 5. This Court disagrees.

As this Court explained in its decision and order, there was ample evidence that James aided and abetted Lavon's shooting and killing Kevin Turner. Among other

---

[2] The Court assumes the reader's familiarity with the factual background and will refer to the facts only as necessary to explain its analysis.

things, Timothy Harris and Michelle Edwards testified that on the day of the shooting, Lavon and James came to their residence, and Lavon asked whether Harris knew "a guy named Buffalo." *See* Docket Item 1073 at 9; Docket Item 1020 at 9-10.  Harris later learned that "Buffalo" was one of Turner's nicknames.  Docket Item 1073 at 19-20, 66. At Lavon's request, Harris and Edwards then took a ride in a truck with Lavon and James, who was driving.  *See* Docket Item 1020 at 12-14.  While they were driving around, Lavon asked Harris whether he knew of any "drug houses."  Docket Item 1073 at 9; *see* Docket Item 1020 at 16.  After a short drive "around the corner," they stopped back at Harris and Edwards's house. *See* Docket Item 1073 at 9-11.  Edwards saw a gun in the front seat "[i]n between [Lavon] and [James]," and as she exited the truck, she told Harris what she saw.  Docket Item 1020 at 17-18, 41-42; Docket Item 1073 at 12-13.

Lavon then told Edwards "to give him a call" when they "purchased some drugs." Docket Item 1020 at 19.  When they got back to their house, Edwards and Harris texted Turner and asked him to bring them $20 worth of crack cocaine.  Docket Item 1073 at 13-14; Docket Item 1020 at 19-21.  At Edwards's direction, Harris then did what Lavon had instructed: he texted Lavon to "[c]ome now."  Docket Item 1073 at 15; *see* Docket Item 1020 at 19-20.  Turner soon delivered the crack cocaine to Harris and Edwards, and almost immediately after Turner left, Harris and Edwards heard four shots.  Docket Item 1073 at 16; Docket Item 1020 at 22-23.  When they looked out their window, they saw that Turner had been shot on their porch.  Docket Item 1073 at 16; Docket Item 1020 at 22-23.

Additionally, video surveillance showed a pickup truck that Detective Troy Earp testified belonged to James arriving at a Coastal gas station—approximately two blocks from the murder scene and one block from Lavon's apartment—about 40 minutes before the shooting. *See* Docket Item 1026 at 70-71, 85-86, 95. James went inside the gas station; looked at the video monitors, which show all the angles of video surveillance; and then exited the gas station without purchasing anything. *See id.* at 93-94. And at approximately 4:28 p.m., a few minutes before the murder, other video surveillance showed James's truck pulling into a Valero gas station about one block from the shooting, stopping in the parking lot in front of a camera, and then pulling away. *See id.* at 94-97.

The government argued in its summation that James was "looking at cameras for a reason"—because Lavon "need[ed] to know which way to go home without being seen."[3] Docket Item 1077 at 4. And, according to the government, that plan worked: Lavon cannot be seen on any of the cameras following the murder because "[t]hey did their homework before the shooting." *See id.* at 6. Taking the evidence in the light most favorable to the government, as the Court must on a Rule 29 motion, there was ample evidence supporting these theories.

---

[3] James moved for a new trial under Federal Rule of Criminal Procedure 33 because Earp made the unsolicited statement that in his opinion this was "reconnaissance." *See* Docket Item 1134 at 64-65. As explained in this Court's decision and order denying James's Rule 33 motion, the Court sustained an objection to that testimony, and there was "no indication that the jury considered Earp's statement despite the Court's sustaining the objection." *See* Docket Item 1237 at 39. But there was nothing improper about the government's arguing in closing that the jury should infer from the evidence presented that James was assisting Lavon in avoiding detection.

In *Medina* and *Delgado*, by contrast, the Second Circuit vacated aiding and abetting convictions where there was no evidence that the respective defendants had "acted in any way to facilitate or encourage" the crimes. See *Delgado*, 972 F.3d at 77 (quoting *Medina*, 32 F.3d at 45). In other words, rather than "'help[ing]' or 'positively encourag[ing]' the commission of a crime," each of those defendants merely was "'a companion' to the actual perpetrator of the crime." See *id.* at 76 (quoting *United States v. Garguilo*, 310 F.2d 249, 253 (2d Cir. 1962)).

In *Medina*, the defendant, Roberto Medina, had been convicted of aiding and abetting the use or carrying of a firearm during and in relation to a crime of violence—attempted robbery—in violation of 18 U.S.C. § 924(c). See *Medina*, 32 F.3d at 42. The evidence showed that Medina had conspired with others to attempt the robbery. *Id.* at 43. But, the Second Circuit held, there was insufficient evidence to convict Medina of aiding and abetting the use or carrying of a firearm during that attempted robbery.

In support of the aiding and abetting conviction, the government relied on the following evidence: "(a) Medina once referred to robberies as 'stickups'; (b) Medina offered a gun to [coconspirator Jose] Lopez and was told that [coconspirator Louie] Villanueva was already planning to carry a gun; and (c) Medina later supplied Lopez with a .31 caliber revolver." *Id.* at 45. The problem, the court explained, was that "Medina [could not] be convicted as an aider and abettor under [section] 924(c) merely because he knew that a firearm would be used or carried and, with that knowledge, performed an act to facilitate or encourage the robbery itself." *Id.* Instead, "the language of the statute require[d] proof that he performed some act that directly facilitated or encouraged the use or carrying of a firearm." *Id.* And, the court found,

5

under that standard the evidence was insufficient because "[t]he gun Medina gave to Lopez was not carried or used by anyone during the attempted robbery and, therefore, Medina's efforts to aid and abet the carrying of that gun [could not] support a [section] 924(c) conviction." *Id.*

Moreover, although Villanueva and another coconspirator had "carried a semi-automatic weapon to the attempted robbery, . . . there [was] no evidence that Medina acted in any way to facilitate or encourage the use or carrying of those weapons." *Id.* Rather, "[b]y the time Medina learned that a firearm would be carried by Villanueva (just two or three hours before the scheduled robbery), Villanueva had already independently determined to carry a firearm." *Id.* at 45-46. And "[s]ince the use of that firearm was a foregone conclusion, and since there is no evidence that Villanueva was told of Medina's offer to supply a gun, Medina could not have counseled or encouraged Villanueva to carry or use it." *Id.* at 46. Finally, while Medina was the mastermind behind the robbery, "his plans did not entail a gun that was actually used or carried during the attempted robbery." *Id.* at 42.

In *Delgado*, the Second Circuit found there was insufficient evidence for aiding and abetting liability despite the fact that the defendant, Domenico Anastasio, "was present when the [g]ang planned its attack," and "[k]nowing full well the murderous intentions of the assembled group, . . . attempted to acquire a firearm of his own so that he could join the shooters." 972 F.3d at 74. But Anastasio did not ultimately attend the shooting; indeed, after the shooters returned, he "complained, '[W]hy didn't you let me go?'" *Id.* (citation omitted).

6

Thus, the Second Circuit found that "Anastasio's conduct [wa]s not enough to satisfy the affirmative act requirement of federal accomplice liability." *Id.* at 77. "Although Anastasio was present while members of the [gang] discussed and formulated its scheme for revenge, nothing in the record suggest[ed] that Anastasio spoke during—much less contributed to—this planning process," the court said. *Id.* "Nor ha[d] the government offered evidence that Anastasio's mere presence at [the] apartment [where the planning occurred] encouraged or otherwise influenced the [g]ang to commit the murders." *Id.* "He did not, for example, supply any of the firearms used during the shooting; provide any information on the location of the [rival gang]; serve as a look-out during the shooting; transport any of the shooters to or from [the location of the crime]; or, after the crime, help shield the shooters from police investigation." *Id.*

Here, by contrast, there was evidence that James did several things to facilitate Lavon's shooting Turner. More specifically—viewing the proof in the light most favorable to the government—James drove Lavon around to assist him in planning for the shooting and helped Lavon avoid detection afterwards. To find otherwise would view evidence and draw inferences in James's favor, which this Court cannot do on a Rule 29 motion.

## **CONCLUSION**

For all those reasons, James's motion for reconsideration, Docket Item 1240, is DENIED.

SO ORDERED.

Dated:   November 24, 2025
         Buffalo, New York

                                         ***/s/ Lawrence J. Vilardo***
                                         LAWRENCE J. VILARDO
                                         UNITED STATES DISTRICT JUDGE